# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

LORI GOODMAN,

        Plaintiff,

v.                                  CIVIL ACTION NO. 3:16-5953

UNITED STATES OF AMERICA,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lori Goodman,[1] brought this action for negligence against the United States of America under the Federal Tort Claims Act ("FTCA"). A bench trial was held before the Court on May 21 through 22, 2019. Based on the findings made herein, the Court **FINDS** in favor of Plaintiff and awards damages in the total amount of $398,017.57.

## I. CAUSE OF ACTION

The FTCA, 28 U.S.C. § 2671, partially waives sovereign immunity and provides a judicial remedy to those who suffer injury or damage as a result of the negligence of employees of the federal agencies of the United States Government. This waiver extends to the actions of employees of federally funded medical facilities through the Federally Supported Health Centers Assistance Act of 1995 ("FSHCAA"). The FSHCAA provides that an injured person may bring her claims against the United States, pursuant to the FTCA, "for damage for personal injury . . . resulting

---

[1] Subsequent to the initiation of this action, Plaintiff married and took the surname "Hart." For purposes of this Memorandum Opinion and Order, the Court shall refer to her by the name used in the caption of this case.

from the performance of medical [or] surgical . . . functions . . . by any commissioned officer or employee of the Public Health Service while acting within the scope of [her] office or employment . . . ." 42 U.S.C. § 233(a). The FSHCAA defines an employee as "a public or non-profit private entity receiving Federal funds under [42 U.S.C. § 254b]," and "any officer, governing board member, or employee of such an entity, and any contractor of such an entity who is a physician or other licensed or certified health care practitioner . . . ." 42 U.S.C. § 233(g)(1)(A).

As the act in question occurred in West Virginia, this state's negligence laws apply. *Bellomy v. United States*, 888 F. Supp. 760, 763–64 (S.D. W. Va. 1995) ("Disposition of actions arising under the FTCA is to be made pursuant to the tenets of law applicable in the state where the negligent act or omission is alleged to have occurred."). Under the West Virginia Medical Professional Liability Act ("WVMPLA"), health care providers are negligent when they "fail[ ] to exercise [a] degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances[.]" W. VA. CODE § 55-7B-3. Furthermore, that failure must be the proximate cause of the injury in question. *Id.*

Overall, damages in a case under the FCTA are limited to the amount presented in plaintiff's administrative claim filed under 28 U.S.C. § 2675(a), "except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b); *see also Adkins v. United States*, 990 F. Supp. 2d 621 (S.D. W. Va. 2014). Damages for past medical expenses are limited to the amounts actually paid for or on behalf of the plaintiff and to those medical expenses which have been incurred but not paid by or on behalf of the plaintiff for which the plaintiff or someone on the plaintiff's behalf is obligated to pay. W. VA. CODE § 55-7B-9d. Noneconomic damages are limited to $250,000, as

adjusted per West Virginia Code § 55-7B-8(c). W.Va. Code § 55-7B-8(a). Presently, the limitation on noneconomic damages is $342,004.61.[2]

## II. FINDINGS OF FACT

Plaintiff Goodman underwent a vaginal hysterectomy on May 6, 2014, at a federally funded medical center, Valley Health – A Woman's Place. The surgeon was Dr. Andrea Kellar and she was assisted by a resident physician, Dr. Jessica Granger. Plaintiff testified that Dr. Kellar recommended a vaginal procedure because she had no history of abdominal surgery and this technique was less invasive, so healing occurs more quickly. Dr. Kellar explained that there were risks, but injury to the bladder occurs less than 1 percent of the time. As reflected by the two informed consent forms signed by Plaintiff—one in the doctor's office and another the morning of the surgery at the hospital—complications could occur, and Plaintiff admitted that she understood this. Dr. Kellar relies on these consent forms to assert that she complied with the standard of care for a vaginal hysterectomy and that any injury to the bladder was an unavoidable risk of the procedure.

Dr. Kellar explained in her testimony how the procedure was performed. She characterized the operation as "uncomplicated" as she encountered an anatomically typical abdominal cavity with no scar tissue or uncommon structure. Dr. Kellar identified the organs and tissue and, after removing the uterus, retracted the bladder to separate it from the vaginal cuff. She testified that she was "well aware of where the bladder was" and had no apparent difficulty as she and Dr. Granger placed sutures in the vaginal cuff. During the surgery, these two physicians shared the duty of using sutures to complete the repair of the vaginal cuff following removal of the uterus.

---

[2] United States Department of Labor, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (adjusting from the date the provision was enacted, up to the most recent data available at the time of this Order.).

Using purple Vicryl sutures which can be observed by the surgeons, she and Dr. Granger first placed sutures on their respective sides of the vaginal cuff and then Dr. Granger placed sutures along the cuff as Dr. Kellar kept the bladder away. One of those sutures placed along the vaginal cuff also penetrated Plaintiff's bladder. Dr. Kellar did not notice any problem with the placement of the sutures and did not observe any injury to the bladder or otherwise. She does not know how any injury to the bladder occurred.

Within a matter of days, Plaintiff began suffering painful urination, urinary leaking, and fever. On May 19, 2014, she had a post-operative follow-up with Dr. Kellar who diagnosed a urinary tract infection and prescribed an antibiotic. Her symptoms persisted, so she telephoned Dr. Kellar's office on May 30, 2014 and spoke to a nurse. On June 14, 2014, she returned to Dr. Kellar's office with complaints of vaginal spotting and bladder leakage. When these symptoms did not resolve, Dr. Kellar arranged for a urological consultation with Dr. Charles Woolums for incontinence and leakage. Her first examination by Dr. Woolums was conducted on September 23, 2014. He then performed a kidney ultrasound on October 2, 2014, and a cystoscopy on October 7, 2014. Dr. Woolums found an abnormality in her bladder which he noted at the time to be "consistent with a stitch/hole in her bladder." Dr. Woolums performed a surgical repair of her bladder on December 8, 2014. He diagnosed a vesicovaginal fistula—a hole between the bladder and the vagina which allowed leakage between the two. The site of this fistula was consistent with a suture being misplaced in the vaginal cuff by entering the bladder as well.

Plaintiff presented the testimony of Dr. Robert Dein as her expert witness as to the standard of care and causation. Dr. Dein is a board-certified obstetrician-gynecologist in practice for thirty-two years in a large obstetrical practice in Pennsylvania and New Jersey. He continues an active surgical practice, including frequent vaginal hysterectomies. His practice entails supervising

residents and assistants. He described the surgical procedure and particularly the placement of sutures following removal of the uterus. Considering Dr. Woolums' findings and the location and nature of the fistula, Dr. Dein concluded, to a reasonable degree of medical probability, that a suture was negligently placed from the vagina into the bladder during the closure of the vaginal cuff and caused the fistula to develop over time following the surgery. Dr. Dein testified that, as the surgeon, Dr. Kellar has the responsibility of properly identifying the anatomical planes to distinguish the vaginal cuff and bladder and to inspect the sutures to detect whether they were properly placed. Thus in his view, whether Dr. Kellar or the resident placed the errant suture, Dr. Kellar failed to meet the standard of care of an attending physician performing a vaginal hysterectomy. Further, given Plaintiff's anatomy and the condition of her organs and tissue at the time of surgery and Dr. Kellar's testimony that she believed that the bladder and vaginal cuff were sufficiently separated during the suturing, Dr. Dein opined that the misplacement of the suture was not merely a recognized and excusable complication or risk of the surgery. He also testified that the misplaced suture caused the fistula which then resulted in the incontinence, bladder leakage, infection, and other symptoms Plaintiff suffered thereafter.

Defendant offered the expert testimony of Dr. Steven McCarus, a board-certified gynecologist who is chief of gynecological surgery at a large hospital. Dr. McCarus has researched and authored literature concerning surgical techniques in performing hysterectomies. He has taught residents the most common techniques for vaginal hysterectomies and described the procedure along with potential risks and complications. In particular, he noted the importance of the patient's specific anatomy and the proximity of the vagina, bladder, uterus, and other parts of the surgical field. Injuries to the bladder are known to occur as a result of the closeness of the vagina and bladder, usually resulting in a bleed or leaking of fluid observable during the surgery.

The bladder may also have sustained a small hole that cannot be seen or does not release fluid because the bladder expands and contracts. He testified that a misplaced suture causing injury to the bladder is a known complication which occurs from between 0.5 and 1.5 percent in all types of hysterectomies. Dr. McCarus concluded that this occurrence is not deviation from the standard of care. He reviewed the operative report and found Dr. Kellar's performance of the surgery to be within the standard of care. He also rejected the claim that a suture caused the fistula, opining that closing of the vaginal cuff was properly done and that there is insufficient evidence to identify the cause of the fistula. Finally, he also testified that neither during the surgery nor in the post-surgery follow-up over the ensuing months was there any failure by Dr. Kellar to detect and treat her bladder injury.

Following the removal of the vesicovaginal fistula by Dr. Woolums, Plaintiff's condition improved but did not completely resolve. Her bladder leakage improved for a time, but returned to a lesser degree when she resumed a more active lifestyle. She was able to return to work in early January 2015 and continued working until Spring 2017. At that time, she experienced urinary tract infections every month, painful bladder spasms, and problems with urination. She was given a prescription for a drug which could help her urination problems, but it was too expensive. She did not seek any assistance, with Dr. Woolums or anyone else, to deal with the cost nor did she seek other treatment. In July 2018, she returned to Dr. Woolums with complaints similar to those she had in the past: some bladder leakage but also difficulty fulling voiding. She self-catheterized several times a day and used saline to irrigate her bladder. Both Plaintiff and her husband testified that she must use a catheter before intercourse and that she still has some occurrences of bladder leakage and pain.

Based on the aforementioned facts and testimony, the Court specifically **FINDS** the following: (1) Ms. Goodman's injuries were the result of an errant suture misplaced during her vaginal hysterectomy; (2) Dr. Kellar had a duty to ensure the correct placement of sutures during the hysterectomy; (3) given the lack of Ms. Goodman's anatomical anomalies, improper placement of the suture failed to meet the applicable standard of care and constitutes negligence; (4) such negligence is the direct and proximate cause of Ms. Goodman's resulting vesicovaginal fistula and related injuries. Accordingly, Ms. Goodman is entitled to damages.

### III. DAMAGES

Plaintiff may recover damages for pain and suffering, mental anguish, loss of enjoyment of life, medical expenses, and lost wages. *See Flannery v. U.S.*, 297 S.E.2d 433 (W.Va. 1982). The Court addresses economic and noneconomic damages separately.

*A. Economic Damages*

Plaintiff credibly testified that her post-operative medical condition affected her ability to be gainfully employed. During the relevant period, Plaintiff worked at a fast-food restaurant. Her daily problems with bladder leakage, urinary tract infections, and other results of the vesicovaginal fistula required her to miss work and interfered with her ability to perform her job. She had frequent episodes of urgent urination, which were both painful and embarrassing, and ultimately led to her quitting work despite needing the income for her family. She lost $1893.00 in wages as a result, and the Court includes this wage loss in the damages.

Through the testimony of the physicians, both the treating doctors and her expert, Plaintiff established medical expenses of $54,119.96.[3] The Court awards this amount as part of Plaintiff's

---

[3] Though the Proposed Integrated Pretrial Order, (ECF No. 94), listed $72,530.70 as the amount of past medical expenses sought, the Court relies upon Plaintiff's exhibit 4 attached to Dr. Dein's transcript for the calculation of past medical expenses.

damages. The Court also notes the West Virginia Code § 55-7B-9a requires the Court to determine any collateral source subtractions before entry of judgment. To that end, the Court **DIRECTS** parties to confer regarding this statutory requirement and advise the Court on or before **August 15, 2019,** whether the parties dispute the matter.

*B. Noneconomic Damages and the Administrative Cap*

Pursuant to 28 U.S.C. § 2675b, Plaintiff's claims for damages are capped at the amount she sought in her administrative claim, with the exception of any intervening facts. On January 14, 2016, Plaintiff submitted her claim and sought a total of $400,000.00.

The Court awards $342,004.61 in noneconomic damages. Plaintiff suffered a significant medical condition which caused pain, discomfort, embarrassment, and mental anguish. Her first year after the hysterectomy was marked by frequent, significant complaints. She described many difficulties over the first eight months for which she sought treatment from Dr. Kellar and Dr. Woolums. Her symptoms interfered with most aspects of her daily life, from routine parenting and housekeeping to her work. Following removal of the fistula in December 2014, she substantially recovered, and was able to return to work in January 2015. She did not seek further treatment until August 2015, when she returned to Dr. Woolums after being treated for a urinary tract infection. She then reported continuing problems with bladder leakage, but the evidence was unclear of the duration, severity, and cause of these symptoms. Plaintiff did not return to Dr. Woolums until July 2018. At that point she was again experiencing some incontinence, frequent and painful urination, requiring her to use a catheter. Dr. Woolums prescribed a medication but Plaintiff testified it was too expensive for her to purchase. Though her symptoms persist, they are not as severe, and she has adjusted somewhat to her condition. Given the cap on noneconomic damages, the persistency and severity of her injury do not permit a higher award.

## IV. CONCLUSION

Based on the aforementioned findings of fact and law, the Court **FINDS** in favor of Plaintiff and awards a total $398,017.57 in her favor. Furthermore, the Court **DIRECTS** parties to confer regarding the statutory requirement that any collateral source subtractions occur before entry of judgment and advise the Court on or before **August 15, 2019,** whether the parties dispute the matter.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: July 12, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE